UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

NICI THOMAS, et al.,                 )
                                     )
        Plaintiffs,                  )
                                     )          No. 6:19-CV-226-REW
v.                                   )
                                     )
TROOPER STEVE WALKER, et al.,        )          OPINION & ORDER
                                     )
        Defendants.                  )
                                     )

*** *** *** ***

A late-night execution of an arrest warrant led to the early-morning arrest of Plaintiff

Joseph Thomas. During the process of arrest, Mr. Thomas fled and resisted Defendant Troopers

Steve Walker, Shawn Boroviak, Michael Logan Howell, and Logan Gay (collectively "the

Troopers"). Plaintiff Nici Thomas claims to have recorded the whole incident, including the

Troopers' use of force. Sensing that the phone had evidence of the crime Mr. Thomas just

committed, the Troopers seized the phone. Defendant Kim Bradley examined the phone after a

search warrant was secured. Plaintiffs sued Defendants for violation of various civil rights,

painting a conspiracy to delete evidence of police brutality. *See* DE 43 (Second Amended

Complaint). After discovery, Defendants now move for summary judgment on all claims. *See* DE

59 (Bradley's Motion for Summary Judgment); DE 62 (Troopers' Motion for Summary

Judgment). For the reasons discussed below, two categories of claim survive; the Court grants

judgment on the balance.

1

## I.    BACKGROUND

On September 20, 2018, Trooper Walker conducted a traffic stop in Laurel County, Kentucky. DE 59-10 (Walker Dep.) at 50;[1] *see also* DE 16-1 (State Court Judgment). During the traffic stop, Walker attempted to arrest the driver, but the driver fled. DE 16-1 at 1. Walker attempted to tase and spray the driver with OC spray to no avail; the driver escaped. Walker Dep. at 51–52. Walker was able to identify the driver as Plaintiff Joseph Thomas. *Id.* at 20. Walker obtained an arrest warrant for Mr. Thomas and charged him with possession of a controlled substance, fleeing or evading police, driving under the influence, resisting arrest, and driving on a suspended license. DE 16-1 at 1. Thomas, now a fugitive, went back to his home. DE 59-3 (Joseph Dep.) at 47.

On September 22, 2018, just before midnight, Walker (warrant in hand) obtained the assistance of Troopers Boroviak, Howell, and Gay in executing the arrest warrant at Mr. Thomas's home. Walker Dep. at 21. When the Troopers arrived, Boroviak and Gay went to the front to knock on the front door. DE 59-11 (Boroviak Dep.) at 18; DE 59-13 (Gay Dep.) at 41. Walker and Howell went around the back of the house to station themselves at a back entrance. Walker Dep. at 21; DE 59-12 (Howell Dep.) at 15. When the Troopers at the front of the house knocked on the door, Mrs. Thomas answered the door and stated that Mr. Thomas was not home. Boroviak Dep. at 18–19; Gay Dep. at 42. Mr. Thomas went to open the back door, and Trooper Howell shined a flashlight on Mr. Thomas's face and identified himself to Mr. Thomas. Howell Dep at 15. Mr. Thomas then closed the door, ran through the house, and jumped out of a window. Walker Dep. at 22; Howell Dep. at 15. Mr. Thomas fled into a wooded area near the house. Walker Dep. at 22.

---

[1] The Court's citations track deposition, rather than ECF, pagination.

Trooper Walker was the first to run after Mr. Thomas. *Id.* Walker commanded that Mr. Thomas stop; Mr. Thomas did not comply. *Id.* Once in the dark woods, Mr. Thomas attempted to hide by lying down and obscuring himself from view. *Id.* at 23. Walker found Mr. Thomas and warned him that he would use his taser if Mr. Thomas did not show his hands and submit for arrest. *Id.* Again, Mr. Thomas did not comply, so, Walker tased him. *Id.* Once the Trooper deactivated the taser, Mr. Thomas got up from the forest floor and again fled. *Id.* Walker attempted to fire his taser again but missed. *Id.*

By this point, the other Troopers had made headway into the wooded area. Boroviak Dep. at 19; Howell Dep. at 16; Gay Dep. at 43. Trooper Gay saw Mr. Thomas stand and attempt to run toward him. Gay Dep. at 43. Gay then tackled Mr. Thomas to the ground. *Id.* On the ground, Mr. Thomas rested on his hands and knees, in what the Troopers described as a downward dog position. Walker Dep. at 28 (describing it as a "dogward-down position"). Walker approached and attempted to lie on Mr. Thomas's legs so he could not resist. Walker Dep. at 23. Walker and Gay state that Mr. Thomas was resisting during this period. *Id.* at 29; Gay Dep. at 44.

Gay and Walker attempted to handcuff Mr. Thomas, but could not successfully do so. Walker Dep. at 24; Gay Dep. at 44. Mr. Thomas then lay prone on his hands, obscuring them from the Troopers. Gay Dep. at 44. Trooper Howell then approached, saw Gay on the left side of Thomas, and Walker on Thomas's legs. Howell Dep. at 16. Howell attempted to lie across Mr. Thomas's right side. *Id.* When Boroviak approached the scrum, he attempted to get to Mr. Thomas's right shoulder and free one arm from underneath Mr. Thomas's body. Boroviak Dep. at 21. All Troopers commanded Mr. Thomas to stop resisting and submit to arrest. *Id.*; Walker Dep. at 36; Howell Dep. at 17; Gay Dep. at 44. Mr. Thomas did not comply. Boroviak, Howell, and

Gay struck Mr. Thomas multiple times in the body and arms. Boroviak Dep. at 21; Howell Dep. at 16; Gay Dep. at 46.

Eventually, Gay was able to get one of Mr. Thomas's arms free and secured a handcuff. Gay Dep at 44. The Troopers then began to free Mr. Thomas's other arm. *Id.* at 47; Boroviak Dep. at 16. Boroviak and Gay were using their flashlights to strike Mr. Thomas's upper arms and his body. Boroviak Dep. at 21; Gay Dep. at 49. Gay dropped his flashlight in the midst of the struggle and resorted to closed fist strikes. Gay Dep. at 50. Gay's strikes landed on both body and head. *Id.* at 58–59. At some point, Boroviak's flashlight struck Gay's hand, breaking Gay's second metacarpal. *Id.* at 44; DE 62-2 (Desai Dep.) at 12 (noting Gay's injuries and the source as being from "a direct blow" to his hand).

The Troopers were eventually able to free Mr. Thomas's other arm. The Troopers then attached a second pair of handcuffs to Mr. Thomas's arm and then connected one pair of handcuffs to the other. Howell Dep. at 16. Mr. Thomas was then escorted out of the wooded area. Trooper Gay lagged behind to look for his flashlight. Gay Dep. at 50. The Troopers deny any force after they gained control of Thomas; Plaintiffs claim post-arrest assault.

During the altercation, Mrs. Thomas had positioned herself on the road running parallel to the house and the wooded area. DE 59-4 (Nici Dep.) at 37–38. At some point during the altercation in the woods, Mrs. Thomas, an observer, engaged her phone's camera application. DE 63-3 at 13 (Ayala's Forensic Report). Mrs. Thomas "firmly believe[s]" that she took a video of the altercation. DE 63-4 at ¶ 1 (Nici Thomas Affidavit). Mrs. Thomas saw the Troopers take Mr. Thomas out of the woods, behind the house, and onto the driveway. Nici Dep. at 39. Mrs. Thomas then confronted the Troopers. *Id.* at 39.

4

Mrs. Thomas approached the Troopers and told them that she had recorded the entire event. Howell Dep. at 22. Howell approached Mrs. Thomas and seized the phone. *Id.* Howell placed the phone in the passenger seat of Walker's police cruiser. *Id.* at 23. Mr. Thomas was then put in Walker's police cruiser. Boroviak Dep. at 23. Walker took Mr. Thomas to the local detention center for booking. After Mr. Thomas was booked in the early morning hours of September 23, 2018, Walker claims he took the phone, turned it off, and sealed it into an evidence bag. Walker Dep. at 38–39. Walker did not know the time this event occurred. *Id.*

At 4:51 a.m., the phone mysteriously was accessed. DE 59-9 (Ayala Dep.) at 18. For a period of about 3 minutes, the phone's data show that applications were opened and viewed. DE 63-3 at 16. The forensic experts disagree about the cause of the access, but all forensic reports, including the report made by Defendant Bradley, indicate that the phone was accessed at that time.

Walker submitted the phone to the evidence lock-up during his next shift, on September 24, 2018. Walker Dep. at 40. On October 28, 2018, the phone was submitted to the Kentucky State Police's Electronic Crime Branch for review. Walker Dep. at 44–45. Defendant Kim Bradley, pursuant to a valid warrant, performed a boot loader physical extraction of the phone's data. DE 59-5 (Bradley Dep.) at 34. This extraction took all data that existed on the phone at the time of the extraction and created a copy of the data. *Id.* This set of data was then analyzed using forensic tools. *Id.* at 30.

Bradley then physically examined the phone by turning it on and scrolling through the device. *Id.* at 34. During this analysis, Bradley accidentally took a picture of herself. *Id.* at 21. Bradley disclosed the accidental photo in her report. DE 59-7 (Lake Dep.) at 43 (recognizing that Bradley included the photo in her report). Bradley did not discover any evidence of a video or

evidence of a deleted video. DE 59-8 at 6. Bradley did discover the 4:51 a.m. phone activity. *Id.* at 4.

Mr. Thomas was prosecuted in state court for the September 20 and September 23 events. *See* DE 16-1. During the prosecution of Mr. Thomas, Defendant Bradley was contacted by defense counsel[2] and asked if any videos were recovered during the forensic examination and if Bradley had seen any activity on the phone while the phone was in KSP custody. Bradley Dep. at 30. In an e-mail to defense counsel, Bradley noted that she did not recover any videos and that there was activity on the phone at 4:51 a.m. related to access to a web browser application. *See* DE 59-8 at 4. In that e-mail, Bradley did not relay the other instances of phone access. *Id.* Defense counsel immediately requested the full bit-for-bit extraction of the phone. *Id.* at 3. The record shows that he got the data.

The state court prosecution resolved on July 11, 2019, with Mr. Thomas entering guilty pleas to several crimes committed on September 20 and September 23. *See* DE 16-1 at 4. Mr. Thomas pleaded guilty to two unrelated counts plus resisting arrest regarding the September 20 event. *Id.* Under the same indictment, Mr. Thomas pleaded guilty to two counts related to the September 23 event: one count of fleeing or evading the police, 1st degree, and one count of resisting arrest. *Id.*

On September 20, 2019, Mr. and Mrs. Thomas sued Defendants in this Court. *See* DE 1 (Complaint). On November 2, 2019, Plaintiffs filed an Amended Complaint. DE 8 (Amended Complaint). On May 15, 2020, after vigorous litigation at the dismissal stage, the Court allowed Plaintiffs to file a Second Amended Complaint, the ultimately operative complaint. *See* DE 42 (Opinion & Order); DE 43 (Second Amended Complaint). Cutting through the sea of contentions,

---

[2] The same counsel that represents Plaintiffs in this matter.

Plaintiffs have two central theories. First, that the Troopers used excessive force against Mr. Thomas, to include post-arrest assault. Second, that the Troopers improperly seized and searched Mrs. Thomas's cell phone (and deleted the video of the encounter). Plaintiffs premise § 1983 constitutional and state law claims on these theories.

Defendant Bradley and the Trooper Defendants now move for summary judgment. Plaintiffs responded to both motions. *See* DE 63 (Response to Bradley's Motion); DE 64 (Response to Troopers' Motion). Defendants replied. *See* DE 65 (Bradley's Reply); DE 66 (Troopers' Reply). The matter stands ripe for review.

## II.    STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the movant to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the

nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

In *Matsushita*, 106 S. Ct. at 1356, the Supreme Court "authorized an inquiry on summary judgment into the implausibility of inferences from circumstantial evidence, not an inquiry into the credibility of direct evidence." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (internal

quotation marks and alterations omitted) (interpreting *Matsushita*). Put differently, it is "error for [a] district court to resolve credibility issues against the nonmovant[.]" *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Even if the evidence is uneven or largely one-sided, this rubric is clear. As the Sixth Circuit has counselled:

> Under the Supreme Court's summary-judgment rules, we must "believe[ ]" the nonmoving party's "evidence" at this stage, *Anderson* [106 S.Ct. 2505], and "disregard" the moving party's conflicting evidence "that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). When witnesses tell differing stories, therefore, we cannot credit the story of the witness that we find more believable.

*Gambrel v. Knox Cty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022).

## III.    ANALYSIS

Mr. Thomas maintains an excessive force claim against the Trooper Defendants (Count I). DE 43 at 9. Mrs. Thomas asserts both Fourth Amendment search and seizure claims and conspiracy to violate civil rights against all Defendants (Count II). DE 43 at 9–11. On the state side, the Thomases also include assault and battery claims against the Troopers and conversion claims against Walker and Bradley (Count IV). DE 43 at 11–12. Finally, Plaintiffs maintain an independent "punitive damages" claim on the state law counts (Count V).[3] DE 43 at 12–13.

---

[3] Plaintiffs' Amended Complaint cites to KRS 411.184 as the basis for the claim. DE 43 at 12. That statute merely defines the terms in KRS 411.186, which in turn determines the process "[i]n any civil action where claims for punitive damages are included[.]"

a.      § 1983 4th and 14th[4] Amendment Excessive Force Claims (Count I)

The Fourth Amendment typically governs excessive force claims. "When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989). This inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The Court's handling of the facts must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* In assessing those circumstances, the Court centrally considers "three main factors: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (quotation marks omitted) (alteration in original).

---

[4] "Fourth Amendment protections extend through police booking until the completion of a probable cause hearing." *Coley v. Lucas Cnty, Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010) ("[T]he probable-cause hearing is a judicial proceeding that affects the 'legal status' of the arrestee [for those arrested without a warrant], constitutionally authorizing his detention throughout the proceedings against him, just as a guilty verdict affects his 'legal status' by authorizing his detention for the duration of his sentence. Consistency with our pronouncement that 'the legal status of the [plaintiff] determines [which a]mendment governs his excessive force claims' requires extending the Fourth Amendment's protections until this change in legal status occurs." (citations omitted))). Since Mr. Thomas's allegations do not extend to booking, the Fourth Amendment is the sole vehicle for his claims.

The parties do not tell the same story regarding the arrest and the force used. On the Troopers' side, all agree that Thomas actively fled and forcefully resisted all the way up to the successful full application of cuffs in the woods. Mrs. Thomas testified that Mr. Thomas did not resist (although she does not deny flight). She also avers that she personally witnessed the Troopers "beating and attacking . . . Joseph Thomas, after he was subdued and handcuffed." DE 63-4 at ¶ 2; *id.* at ¶ 5 ("My husband stopped resisting and the Defendant Troopers continued to beat him after he was handcuffed."). The context shows a flight and resistance prone arrest target that Troopers had great difficulty arresting; that said, the state of the record includes a sworn eyewitness claiming post-handcuff gratuitous force against Mr. Thomas.

First, the Court addresses the lone affidavit because of the primacy it plays in Plaintiffs' version of events. Mr. Thomas contests the summary judgment motion by relying *solely on* Mrs. Thomas's affidavit.[5] *See* DE 64 at 12 ("That statement alone is really all that should be required

---

[5] The Court considered whether the affidavit approaches the boundary of the 6th Circuit's "sham-affidavit" rule. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). The Court must first ask "whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony.'" *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). "If so, absent a persuasive justification for the contradiction, the court should not consider the affidavit." *Id.* "If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L.*, 448 F.3d at 908.)) Courts can consider the following, non-exhaustive list, of factors: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Aerel, S.R.L.*, 448 F.3d at 909 (alteration in original) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). The defense did not raise the issue, and the Court does not see the affidavit as violative. Mrs. Thomas sat for her depo. The defense shallowly probed her knowledge of the night. That Mrs. Thomas claimed to have seen post-arrest violence is hardly a surprise, given the Second Amended Complaint content. DE 43, at ¶¶ 30–31. Yet, the examination delved little into what she actually saw. Her sworn affidavit properly supports Plaintiffs' claims and impacts the calculus.

in response to Defendant Troopers' 35-page Motion."). Certainly, the affidavit allegations are brief. It is true that "[c]onclusory allegations, unsupported by specific evidence, cannot establish [a] factual dispute sufficient to defeat a motion for summary judgment." *Pierce v. Ocwen Loan Servicing, LLC*, No. 20-6057, 2021 WL 4129526, at *2 (6th Cir. Sept. 10, 2021) (citing *Lujan v. Nat'l Wildlife Fed'n*, 110 S. Ct. 3177 (1990)). "A conclusory affidavit 'which conflicts with all of the documentary evidence' does not create a genuine dispute of material fact[.]" *Id.* (quoting *G.D. Deal Holdings, LLC v. Baker Energy, Inc.*, 291 F. App'x 690, 696 (6th Cir. 2008).

In *Pierce*, the plaintiffs, "offered only Mr. Pierce's unsupported, conclusory affidavit[.]" *Id.* The affidavit also failed to "identify specific" facts that would gird the plaintiffs' claims. *Id.* This case differs. *Pierce* was a financial case, and the affidavit there conclusorily contradicted the terms of banking agreements and account records. Here, Plaintiffs have long premised their theories on violence extending past the point of arrest; Mrs. Thomas avers that she saw the incident and that the Troopers continued to beat and attack Mr. Thomas even after cuffing him. There was a violent encounter. When it ended matters, and Mrs. Thomas's affidavit, which supplements her prior deposition, is competent proof on the timing. The Court, though seeing a wall of contrary proof, must credit it in this context.

The Supreme Court has discussed the evaluation of evidence clearly contradictory to objective record evidence. *See Scott v. Harris*, 127 S. Ct. 1769 (2007). In *Scott*, the Supreme Court completely disregarded the plaintiff's version of the relevant events because his claim was "blatantly contradicted" by objective video evidence. *Id.* at 1769. The 6th Circuit has recently reviewed *Scott* and discussed how district courts should address disproportionate and discordant evidence in a summary judgment record when the contradictions are not with objective video evidence, but "with the bulk of the summary-judgment record." *See Gambrel*, 25 F.4th at 396. In

*Gambrel*, the Circuit discussed the current split in interpretation of *Scott*'s reach. *Id.* at 405. (comparing the 4th and 5th Circuits with the D.C. and 11th Circuits). Ultimately, the Circuit decided not to "enter this debate." *Id.* However, the Circuit did provide some context for when testimony could be "not so 'inherently incredibly' as to allow [courts] to disregard it[.]" *Id.* (first quoting *Morton v. Kirkwood*, 707F.3d 1276, 1284 (11th Cir. 2013), and then citing *Robinson v. Pezzat*, 818 F.3d 1, 10–11 (D. C. Cir. 2016)).

> Hobbs seemingly is a disinterested witness. And his testimony does not conflict with objective (and indisputably authentic) evidence like a video or audio recording; it conflicts with other witnesses' testimony. The Officers identify no case that has allowed courts to reject one person's sworn testimony as 'incredible' simply because other witnesses had a different recollection. In addition, some circumstantial evidence supports Hobbs's revised account. The Officers testified that they suffered no physical injuries during the confrontation, save a knot on [one officer]'s leg. They also had only [the victim]'s blood (none of their own) on their clothes.

*Id.* The Court is dubious on weight. This is especially so given Mrs. Thomas's claim that Mr. Thomas categorically did not resist. The defense's counter to the affidavit is weight-based; the defense focuses on the darkness and geometry of the scene. DE 66 at 9–11. Although the Troopers claim "a reasonable jury could not believe Mrs. Thomas," *id.*, the rules require that the Court credit her version. Further, it was dark, but the Troopers were using their flashlights. Also, Mrs. Thomas claimed she was actually filming (and thus, inferentially, seeing) the full encounter. A witness testifying on personal knowledge to post-arrest gratuitous violence creates a fact question.

The Court sequentially scrutinizes each episode of force application.[6]  The record describes three events: 1) the two taser shots in the woods, 2) the confrontation with all officers and Mr.

---

[6] "This approach requires [a reviewing court] to evaluate the use of force by focusing on the split-second judgment made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich*, 945 F.3d at 978 (quotation marks and citation omitted).

Thomas in the woods, and 3) the escort from the woods back to the police cruiser. The Court, however, notes that Defendants invoke *Heck v. Humphrey*, 114 S. Ct. 2364 (1994). That case bars recovery on the first two events, up to arrest, given the association between those events and the underlying state convictions for Mr. Thomas.

> Take the Court's previous discussion of *Heck*:
>
> With respect to whether *Heck* bars an excessive-force claim, "[t]he key inquiry . . . is whether [the] excessive-force claim pursuant to § 1983 would have implied the invalidity of [the] criminal convictions." *Swiecicki v. Delgado*, 463 F.3d 489, 493 (6th Cir. 2006). The Sixth Circuit has recognized that "some excessive-force claims would not necessarily imply the invalidity of a conviction for resisting arrest." *See id.* at 495; *id.* at 504 (Sutton, J., concurring in part, concurring in the judgment, and dissenting in part) ("As a matter of sheer logic, one may bring a successful excessive-force claim without having to establish that the resisting-arrest charge was unlawful: An officer could legitimately arrest a suspect but use excessive force in bringing the suspect to the station.").

DE 42 at 15. This Court concluded that, at the *motion to dismiss* stage, the Plaintiffs "plausibly alleged an unconstitutional use of force that occurred after Mr. Thomas's act of resistance and any use of force reasonably necessary to subdue him." *Id.* But that stage has passed. And Mr. Thomas does not contest he was validly convicted by the Commonwealth for fleeing or evading police in the first degree and resisting arrest.[7]

He also does not appear to contest what happened *before* the Troopers handcuffed him. *See, e.g.,* DE 64 at 2 ("However, eyewitness testimony will confirm that the Defendant Troopers continued to beat Mr. Thomas long after Mr. Thomas was subdued."); *id.* at 5 ("The key factual issue for the claims against the Defendant Troopers, and a question for the jury, is whether the

---

[7] Mr. Thomas does claim, somewhat obliquely, that the resisting arrest charge was valid because he ran away. DE 64 at 5. This ignores that the fleeing charge and the resisting arrest charge were factually distinct. *See* DE 16-1 at 1–2.

Defendant troopers continued to beat and attack Mr. Thomas after Mr. Thomas was handcuffed and subdued.").

Because the Troopers had a valid arrest warrant, they undoubtedly had the right to effect Thomas's arrest. He pleaded guilty to resisting that arrest (KRS 520.090) and to fleeing and evading (KRS 520.095) during the encounter. The interaction of the force used and Kentucky law on self-defense means that any examination of the force relative to the actual arrest would contravene *Heck*.[8] Plaintiffs do not really contest this; instead, they focus on the post-arrest force issue.

Regarding post-arrest force, "[A]n excessive claim is not barred when the alleged use of force occurred *after* the suspect was handcuffed and brought under control." *Matheney v. City of Cookeville, Tenn.*, 461 F. App'x 421, 431 (6th Cir. 2012). "In such a case, the force would not be 'inextricably intertwined' with the suspect's resistance to arrest." *Id.* In *Matheney*, the Circuit granted summary judgment on a claim of post-arrest excessive force where the plaintiff made "one vague reference alleging a use of excessive force after he was handcuffed." *Id.* The plaintiff claimed that "police officers continued to torture [plaintiff], whose leg was now severely injured, after his arrest." *Id.* The Circuit found this argument insufficient, because he did not "make any attempt to develop or otherwise explain how this constitutes excessive force." *Id.* Ultimately, the Circuit found that the argument failed because the plaintiff did not "allege that the dog bite, knee strikes, or taser deployment occurred after he was handcuffed." *Id.*

---

[8] Thus, *Heck* applies "when excessive force is an affirmative defense to the crime[.]" *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). Under Kentucky law, excessive force could excuse resisting arrest, the § 520.090 conviction Thomas received from the September 23 arrest. *Settles v. McKinney*, No. 3:12-CV-00368, 2013 WL 5346503, at *3 (W.D. Ky. Sept. 23, 2013) ("However, excessive force *is* a defense to resisting arrest in Kentucky."). As such, the Court views *Heck* as precluding inquiry into the force used prior to the culmination of arrest.

The call is close on this record, but Mrs. Thomas's affidavit is enough to create a fact issue on the post-arrest interaction. She avers that the Troopers beat and assaulted Mr. Thomas after they had him handcuffed. Thus, unquestionably there was a violent encounter. The encounter either ended at the point of arrest or extended past the arrest. A jury must determine whether the Troopers immediately relented. If the Troopers "continued to beat him after he was handcuffed," DE 63-4 at ¶ 5, such gratuitous force, in this context, would be excessive and clearly outside the bounds of law. *Gambrel*, 25 F.4th at 402 (assessing context of continued use of force after end of resistance: "[T]he Fourth Amendment prohibits officers from using 'gratuitous' force that is unnecessary to effectuate the arrest of a person who has ceased resisting.") (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)). Once the officers had Thomas cuffed, additional beatings or attacks on him would, if proven, be gratuitous and improper. Perceiving fact questions for resolution by a jury, the Court **DENIES** summary judgment on the post-arrest excessive force claim.[9]

>   b.   § 1983 4th and 14th Amendment Search & Seizure Claims (Count II) [10]

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]'" *Terry v. Ohio*, 88 S. Ct. 1868, 1873 (1968). An unconstitutional seizure of personal property could support a § 1983 claim. *See, e.g., Fox v. Van Oosterum*, 176 F.3d 342, 349–52 (6th Cir. 1999)

---

[9] The Court sees nothing of consequence as the Troopers led Mr. Thomas to the cruiser. At one point, Mrs. Thomas says he was "dragged" to the car; this was not, though, her deposition testimony.

[10] On review of the Troopers' motion, it appears that they do not seek judgment on the search claim. *See, e.g.*, DE 62 at 1 ("Thus, the Trooper Defendants are entitled to summary judgment on Mrs. Thomas' claims that her cell phone was *illegally seized and converted*[.]" (emphasis added)). However, in reply, the Defendants describe the argument as applying to "any such claim." DE 66 at 8. To ensure a complete record, the Court assumes the motion asks for summary judgment on the search claim and briefly addresses it here.

(discussing the contours of a § 1983 action for violation of the Fourth Amendment's prohibition on unreasonable seizures of personal property). "An officer may seize personal property without a warrant if the officer has a reasonable suspicion that the property contains evidence of a crime." *United States v. Mason*, No. 5:20-69-KKC-MAS, 2020 WL 6492911 (E.D. Ky. Nov. 4, 2020) (citing *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997)). "The scope of the seizure must be reasonable, both in duration and intrusiveness." *Bennett v. City of Eastpointe*, 410 F.3d 810, 825 (6th Cir. 2005) (citations and quotation marks omitted). Exigent circumstances may also justify a warrantless seizure. "[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless [seizure]." *Kentucky v. King*, 131 S. Ct. 1849, 1857 (2011) (quotations and citations omitted).

The seizure of Mrs. Thomas's phone was constitutional. Mrs. Thomas told the Troopers that she had recorded the entire altercation. Howell Dep at 22. Trooper Howell seized the phone with probable cause to believe that the phone contained evidence of a crime: video evidence of Mr. Thomas resisting arrest and fleeing or evading (crimes later established by guilty pleas). Moreover, Trooper Howell validly seized the phone to prevent the imminent destruction of such evidence. As the sole owner of the phone, Mrs. Thomas could have destroyed or lost evidence of the crime; Howell's warrantless seizure ensured Mrs. Thomas could not destroy the phone. *See United States v. Bradley*, No. 09-136-JBC, 2010 WL 2471885, at *3 (E.D. Ky. June 16, 2010) (finding exigent circumstances for warrantless seizure of a laptop where defendant "could have attempted to destroy evidence once out of the investigators' presence").

Mrs. Thomas argues in response that "the phone was not seized as evidence but rather to destroy evidence." DE 64 at 20. Mrs. Thomas supports this claim by pointing to the alleged subjective intent of the Troopers: "any reasonable juror [could] conclude that the Defendant

Troopers had no intention of using the phone as evidence in the prosecution of Mr. Thomas, but rather seized the phone to avoid liability for their violent assault and battery of Mr. Thomas." *Id.* at 20–21. But this argument belies a key of Fourth Amendment jurisprudence: the Court must undertake "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 98 S. Ct. 1717, 1723 (1978). This objective assessment does not take into account any subjective intent of the Troopers. Accordingly, the seizure of the phone was valid. And, of course, Mr. Thomas did commit crimes that night.

An unconstitutional search can also validly undergird a § 1983 claim. *See, e.g.*, *Smith v. Thornburg*, 136 F.3d 1070, 1074–76 (6th Cir. 1998); *Thomas v. Plummer*, 489 F. App'x 116, 120 & n.5 (6th Cir. 2012) (countenancing a "Fourth Amendment illegal-search claim"); *Pullin v. City of Canton*, 133 F. Supp. 2d 1045, 1053 & n.7 (N.D. Ohio 2001). "To maintain" such a claim, Mrs. Thomas "must show: (1) that [the] search did, indeed, violate the Fourth Amendment; and (2) that, as of [the date of the search], th[e] violation was so clear that any reasonable officer would have understood that []he should not have done what [the officer(s)] did." *Thomas*, 489 F. App'x at 120. Even if a search was invalid under the Fourth Amendment, qualified immunity protects "officers' reasonable mistake[s] of fact." *Smith*, 136 F.3d at 1076.

The Troopers claim that the 4:51 a.m. phone activity involved processes that were initiated by a non-volitional shutdown cycle. *See* DE 66 at 7. However, there is a genuine dispute of material fact on whether the phone was accessed by a human on the morning of the raid. *See* Lakes Depo at 93–94. Plaintiffs' expert specifically so opined. For example, Lakes stated in his deposition that he was certain that the activity described in the bit-for-bit extraction involved a human using the phone and specifically touching icons. Lake Dep at 92–93. Moreover, Lake described (and the Troopers agree) that the phone's shutdown procedure as recorded in the bit-for-bit extraction

18

postdates the 4:51 a.m. activity entries. Lake Depo at 95; *see also* DE 66 at 7 ("The activity was identified as occurring in the three minutes before the phone was powered down[.]").

Defendants do not have a meaningful response to this argument in reply. In fact, Defendants recognize 1) that the warrant was not secured until after the purported search, 2) the phone was powered down three minutes after the activity, and 3) that Mr. Lakes "believed someone was touching the phone." DE 66 at 7. Moreover, Walker maintains that he was in sole position of the phone at the time the bit-for-bit extraction shows access. *See* Walker Dep. at 43–45 (discussing the chain of custody). Accordingly, there is a dispute of fact regarding the status of the phone during this window.

This dispute of fact is also material. Search of a cell phone, absent a warrant, is an unconstitutional search. *See, e.g., Riley v. California*, 134 S. Ct. 2473, 2485 (2014) (holding that "officers must generally secure a warrant before conducting [searches of data on cell phones]"). Walker disclaims the search and does not contend a warrantless search would have been lawful. *See* Walker Dep at 38 (discussing sealing a cell phone until it is put into evidence); *see also Dahl v. Kilgore*, No. 20-6392, 2021 WL 3929226, at *7 (6th Cir. Sept. 2, 2021) ("In conclusion, the Supreme Court in *Riley* clearly established Dahl's right to be free from an unreasonable search of his cell phone."). Accordingly, the Court denies summary judgment on this claim on the Rule 56 rubric.

### c. § 1983 Conspiracy Claim (Count II)

A plaintiff must prove three elements to make out a claim for conspiracy under § 1983: the existence of a single plan, a shared conspiratorial objective to deprive plaintiff of his or her constitutional rights, and an overt act in furtherance of the conspiracy that caused injury. *Jackson*, 920 F.3d at 362 (internal quotation omitted). "Rarely in a conspiracy case will there be direct

evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000). "Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). However, there must be evidence from which a reasonable juror could infer the existence of a single plan and shared objective. *See Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361, 374 (6th Cir. 2018) (finding sufficient evidence of conspiratorial agreement based on joint filing of criminal complaint and officers' knowledge that evidence did not establish probable cause); *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015) ("While each of these alleged misdeeds may have occurred independently, they are sufficiently intertwined so as to suggest an agreement between the perpetrators.").

Plaintiffs base their civil conspiracy claim on the allegation that Defendant Bradley covered-up Defendant Walker's wee-hours access of the phone. *See* DE 63 at 12 ("The key evidence in support of Plaintiffs claims [sic] against Defendant Bradley is her email to counsel and the Defendants' expert report and testimony."). Plaintiffs point to Bradley's statement concerning activity on the phone. Defendant Bradley told Mr. Thomas's criminal counsel that "[t]he only activity on the phone in the time frame you specified below is on 9/28/2018 at approximately 04:51 AM. It is only one web artifact in reference to Craig's List." DE 59-8 at 4. Per Plaintiffs, "[t]he logical conclusion is that Defendant Bradley lied to try and protect the activity of Defendant Walker during the Illegal Search Period." DE 63 at 4. Critically, the claimed injury centers on the allegedly deleted video; that injury has no legs on this record.

Whatever Mrs. Thomas intended or may believe, the video's existence and purported deletion come down to data. Both sides have experts. The experts have analyzed the imaged phone;

they agree that there is no evidence to support that a video ever existed. *See* DE 63-3 at 7 ("No picture or video was taken by Plaintiff Nici Thomas with the LG Phone on September 23, 2018, therefore no video evidence was deleted by the Kentucky State Troopers."); *see also* Lakes Dep at 46 ("I really don't have any disagreements [with the Ayala Report]. I mean, item 20."); *id.* at 68 ("Q: There was no video evidence that was deleted? A: [A]s far as on that date and time, I agree"); *Id.* ("Q:  There was never any video evidence that was deleted? A: Not that I could see, no."). They agree there is no evidence that anyone deleted a video. As such, there simply is no injury, relative to this topic, for analysis.

Even on the phone access issue, no reasonable juror could find for Plaintiffs in the conspiracy context. Bradley not only identified an access point; she facilitated defense counsel's receipt of the raw data. Bradley, of course, was in no way involved in the case until she searched the phone, under a valid warrant, some forty-five days after the September arrest. Given the sequence and the empirical proof, there is not an adequate evidentiary basis for a jury to find a conspiracy, any shared objective, or any cognizable injury.

Viewing the evidence in a light most favorable to the Plaintiffs, the Court finds that no reasonable jury could find in Plaintiffs' favor. Alternatively and additionally, the intracorporate conspiracy doctrine bars recovery on the claim. If "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy[.]" *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994) (quoting *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991)); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 817–20 (6th Cir. 2019) (extending *Johnson*'s holding from § 1985 suits and applying it to § 1983 suits). *Jackson* also recognized a well-noted exception: the intracorporate conspiracy doctrine does not apply when "the defendants were alleged to have been acting outside

21

the scope of their employment." 925 F.3d at 819–20. The Plaintiffs do not dispute that Bradley and the Troopers are members of the same collective entity. *See* DE 63 at 13.

Plaintiffs argue, *petitio principii*, that the intracorporate conspiracy doctrine cannot apply because violation of 4th Amendment rights is not within the scope of Defendants' employment. *See* DE 63 at 14. True enough, the government is not in the business of rights violation. However, Plaintiffs sweep too broadly. The question is whether the actions that comprise the claimed violation are within the scope of the employment. *See Johnson*, 40 F.3d at 841 (discussing non-exhaustive factors to be considered when evaluating scope of employment). Here, Plaintiffs put the whole conspiracy on Bradley's shoulders. Acting in the scope of her authority, Bradley relayed information to defense counsel, directed counsel to seek authorization to receive the bit-for-bit extraction, and then communicated with the Commonwealth Attorney to finalize authorization. *See* DE 59-8 (Bradley and Counsel E-Mail Exchanges). These actions were surely within the scope of her employment. Plaintiffs point to no other proof to sustain the claim. Accordingly, the Court finds, in the alternative, that the intracorporate conspiracy doctrine applies on this record. The Court will grant summary judgment on this claim.[11]

### a.  State Assault and Battery (Count III)

Kentucky law defines battery as "any unlawful touching of the person of another" and requires only single intent; that is, the actor need only intend to make contact, not that the contact be harmful. *Vitale v. Henchey*, 24 S.W.3d 651, 657–58 (Ky. 2000) (internal quotation omitted). "However, Kentucky law partially shields police officers from liability for [battery]." *Tollison v. City of Independence*, No. 13-55-DLB-CJS, 2015 WL 5684030, at *12 (E.D. Ky. Sept. 25, 2015).

---

[11] And Plaintiffs offer no caselaw to support extending the elements of a state crime into the § 1983 conspiracy framework.

"Under Kentucky law, an 'officer making an arrest may use such force as may be necessary to make the arrest but no more.'" *Hartman v. Thompson*, 931 F.3d 471, 486 (6th Cir. 2019) (quoting *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. Ct. App. 1973); *see also* KRS 431.025(3) ("No unnecessary force or violence shall be used in making an arrest."); KRS 503.090(1) (providing that an officer may arrest by force when he "[b]elieves that such force is necessary to effect the arrest; . . . [m]akes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and . . . [b]elieves the arrest to be lawful").

A plaintiff's battery claim against a law-enforcement officer is likely to meet the officer's defense that the use of force was justified and therefore not a battery. In describing this situation, some courts have referred to non-justified force as "excessive force." For example, in *Dunn v. Felty*, 226 S.W.3d 68 (Ky. 2007), the Kentucky Supreme Court explained:

> In the context of an arrest, an officer is liable for excessive force in two circumstances: (1) he or she has reasonable grounds for making the arrest but used more force than was necessary; and (2) he or she only used necessary force in effecting the arrest but there were, in fact, no reasonable grounds for the arrest.

*Id.* at 74. But "excessive force" in this context seems to be a shorthand way of describing a defendant-officer's use of non-justified force. In other words, Kentucky courts' interpretations of "excessive force" in the context of an officer's alleged battery do not necessarily import or fully overlap the § 1983 excessive-force analysis. Despite the shared use of the term, the objective-reasonableness inquiry under the Fourth Amendment does not precisely parallel the justified-force analysis under Kentucky law. *See Coitrone v. Murray*, 642 F. App'x 517, 524 (6th Cir. 2016) ("[T]he analysis of excessive force claims under § 1983 is different from the analysis under state law.") (internal quotation omitted). However, the Kentucky Court of Appeals once observed that "[c]onstitutional search-and-seizure jurisprudence provides similar substantive results." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. 2007).

As for a claim of battery in the course of seizing personal property, similar rules apply. Under Kentucky law, an officer may utilize some amount of force in undertaking lawful duties. KRS 503.040. A plaintiff's battery claim against a law-enforcement officer again, in this context, calls for a proper measure. "[I]t has long been held that a person with legal authority to act has a defense to an intentional tort claim" and "a police officer [may be] insulated from liability when taking property into evidence." *Wade v. City of Richmond*, No. 2003-CA-000957-MR, 2005 WL 1593748, at *1 (Ky. Ct. App. July 8, 2005).

In this case, Mr. Thomas extends his excessive force theory to the state assault and battery claims. Mrs. Thomas independently alleges assault and battery against Trooper Howell for seizure of the cell phone. As for Mr. Thomas, the result tracks that of the federal claim. The state conviction (and the related defensive implications) would foreclose battery as to the pre-arrest altercation. However, again, there is competent, if thin, proof that the use of force extended beyond the completion of arrest. Proof that the Troopers beat Mr. Thomas post-cuffing would be actionable under Kentucky law. Thus, that slice of the claim survives. The Troopers do not claim that immunity would shroud post-arrest gratuitous violence.

Mrs. Thomas's claim for assault and battery must also fail. As described above, the taking of the cell phone was justified. Any reasonable force necessary to effectuate that seizure would be lawful force. She does not claim excessive force here; indeed, Mrs. Thomas herself concedes the argument. "As it pertains to Mrs. Thomas, if Defendant Howell had seized the phone as evidence, then the claim for Assault and Battery of Mrs. Thomas would not be valid." DE 64 at 20. Accordingly, the Court grants summary judgment on this claim.

b.   State Law Conversion Claim (Count IV)

"Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014). Kentucky requires these elements:

(1) the plaintiff had legal title to the converted property;
(2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;
(3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;
(4) the defendant intended to interfere with the plaintiff's possession;
(5) the plaintiff made some demand for the property's return which the defendant refused;
(6) the defendant's act was the legal cause of the plaintiff's loss of the property; and
(7) the plaintiff suffered damage by the loss of the property

*Jasper v. Blair*, 492 S.W.3d 579, 583 (Ky. Ct. App. 2016); *Ky. Ass'n of Cntys. All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005). Defendants are entitled to summary judgment on this claim.

Plaintiffs allege that Defendants Walker and Bradley are liable for conversion because they deleted the video of Mr. Thomas's arrest. However, all experts agree that there is no evidence of a video being made or deleted. Lakes Dep. at 46; Ayala Dep at 25 (noting last creation of pictures or videos as 9/20/2018). Plaintiffs completely misconstrue the point. Per the Plaintiffs: "The forensic evidence did not find confirmation of [the allegation that Mrs. Thomas recorded a video] in the mountains of data in the bit-for-bit data extraction. However, when one searches for a needle in the haystack, and does not find a needle, it does not conclusively prove that there is no needle in the haystack." DE 63 at 10.

The experts, on the other hand, agree that there is simply no needle. *See* DE 63-3 at 7; *see also* Lakes Dep at 46; *id.* at 68; *Id.* On this record, with no evidence of a video, Plaintiffs cannot

support that there actually was a phantom video or that any person converted it.[12] Mrs. Thomas's naked belief that she made a video, a belief that conflicts with all of the experts and the objective data, is insufficient to create a triable issue. Speculation will not do. Accordingly, the Court grants summary judgment on this claim.

   c. Qualified Immunity

  "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Qualified immunity protects an officer unless the plaintiff demonstrates that "(1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional." *Hicks*, 958 F.3d at 430. The Court may address the two prongs in any sequence. *See id.*

  "A right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton*, 949 F.3d at 947 (6th Cir. 2020) (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation omitted)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 947–48. "After a defending officer initially raises

---

[12] There is some discussion on whether Defendant Bradley's accidental photo may have also inadvertently deleted residual evidence of a video. However, Plaintiffs' expert agrees that Bradley's initial extraction, which showed no evidence of a video existing, was untainted. Lakes Dep at 51. Lakes criticizes Bradley's handling of the phone and preservation of the physical manifestation of the data. *Id.* at 43–44. However, Lakes does not challenge the veracity of the initial Bradley extraction.

qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* at 947. At bottom, the doctrine "allows police officers breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation marks omitted).

As to state immunity, Kentucky "[p]ublic officers are responsible only for their own misfeasance and negligence and are not responsible for the negligence of those employed by them if they have employed persons of suitable skill." *Yanero v. Davis*, 65 S.W.3d 510, 528 (Ky. 2001) (citations omitted). "[W]hen an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, 'which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.'" *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (quoting *Yanero*, 65 S.W.3d at 522). Determining whether an action occurred "in a legally uncertain environment" ultimately requires "classifying the particular acts or functions in question in one of two ways: discretionary or ministerial." *Turner v. Nelson*, 342 S.W.3d 866, 874 (Ky. 2011) (quoting *Haney*, 311 S.W.3d at 240). Qualified immunity protects individuals performing discretionary acts, but not ministerial acts. *See id.*

The Court sees fact questions over the duration of the force and over the existence of an improper search. The clarity of the right against gratuitous force against a detained and non-resistant person, and of the right against warrantless phone search signal the need for a trial on the claims. Similarly, the persisting state claim on the use of force would, perforce, avoid state immunity.

## IV.     CONCLUSION

Accordingly, the Court **GRANTS** DE 59 and **GRANTS in part and DENIES in part** DE 62. After the brush is cleared, the only remaining claim is Mrs. Thomas's claim against Trooper Walker for the Fourth Amendment search violation and Mr. Thomas's federal and state claims for excessive force allegedly occurring **after** the Troopers fully cuffed him on September 23, 2018. The Court dismisses all other claims and dismisses Defendant Bradley.

This the 31st day of March, 2022.

**Signed By:**

**_Robert E. Wier_**

**United States District Judge**